Filed 10/27/21  P. v. Payne CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Calaveras)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DEAN ALLEN PAYNE,<br><br>    Defendant and Appellant. | C086844<br><br>(Super. Ct. No. 16F6862) |

Defendant was operating his boat on Lake Tulloch when he ran over the victims Rachael P. (Rachael) and Robin T. (Robin), who were riding on an innertube being towed by Dustin T.'s boat.  It is undisputed that defendant was intoxicated at the time.  Both victims sustained great bodily injury causing them to become comatose due to brain injury.  A jury found defendant guilty of unlawfully operating a vessel while under the influence, causing bodily injury.  Additionally, the jury found true, as to each victim, an allegation that defendant personally inflicted great bodily injury and a separate allegation

1

that he personally inflicted great bodily injury causing the victims to become comatose due to brain injury.

On appeal, defendant asserts that (1) several statements he made to law enforcement were made in violation of his *Miranda* rights[1] and that his statements were involuntary, (2) the trial court prejudicially erred in denying his request for certain pinpoint jury instructions relevant to his defense, (3) he did not "personally inflict[]" the injuries on the victims because Dustin T.'s operation of his boat was an independent intervening cause of the injuries, and (4) the trial court erred in imposing two enhancements for personally inflicting great bodily injury causing the victim to become comatose due to brain injury because there was only one offense alleged in the information.

We affirm the judgment but order an amendment to the abstract of judgment to reflect the trial court's oral imposition of the court operations assessment and criminal conviction assessment fee.

**FACTUAL AND PROCEDURAL BACKGROUND**

**The Charges and Allegations**

Defendant was charged by information with unlawfully operating a vessel while under the influence causing bodily injury to Rachael and Robin. (Harb. & Nav. Code, § 655, subd. (f); count 1.) The information further alleged four special allegations. In the first and third special allegations, the information alleged that defendant personally inflicted great bodily injury on each of the two victims, causing each of them to become comatose due to brain injury within the meaning of Penal Code section 12022.7, subdivision (b).[2] In the second and fourth special allegations, the information alleged

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

[2] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

2

that defendant personally inflicted great bodily injury on each of the two victims within the meaning of section 12022.7, subdivision (a).

## Prosecution Evidence

On July 24, 2016, Dustin T. (Dustin) was on his boat on Lake Tulloch with his wife Kim G. (Kim), Rachael, her husband Brian P. (Brian), Robin, her boyfriend Jeff S. (Jeff), and three children. They were boating, swimming, and innertubing around the lake. Dustin testified that Kim was the lookout on the boat, and that she had a flag with her at all times. Asked if anyone asked her to serve as lookout for other boats, Kim testified that she was on the boat with Dustin frequently, and "he doesn't have to ask me I do that as a matter of course."

Towards the end of their day on the lake, Dustin was driving his boat and towing Rachael and Robin on the innertube. Dustin noticed a very large boat "coming right at" them from the other side of the lake. The larger boat was going very fast, what Dustin described as "violent fast" and "[e]xtremely fast." He estimated that the boat may have been going 60 miles per hour or more, and testified that "sixty seventy miles on the water is extremely fast." Brian saw the much larger boat approximately 60 or 70 feet away, speeding directly towards them, just to the right of Dustin's boat.[3] Jeff testified that the

---

[3] Regarding the approaching boat, the Brian was asked the following questions and gave the following answers:

"Q. Was it directly in front of your boat at that time?

"A. It appeared to be just off to the right of our boat.

"Q. And at that point in time [Dustin] was going straight?

"A. Correct.

"Q. And then he turned to the left?

"A. That's correct."

boat "was speeding and going way faster th[a]n you should be going." Another witness who was not on Dustin's boat testified that the boat was "going very fast." Yet another witness testified that she saw the larger boat on the lake prior to the incident, that the boat seemed too big for Lake Tulloch, and that it appeared to be going too fast for the size of the lake.

The driver of the larger boat was not looking at Dustin's boat. Dustin stood up, pulled back on the throttle, and yelled and waved his hands trying to get the approaching boater's attention. Kim screamed, waved her hands, and tried to wave the flag.

As the boats approached each other, Dustin "made one move and it was the only move [he] could make." He turned to the left, avoiding a head-on collision. He testified that if he had not done so, the larger boat would have "split us in half." Dustin acknowledged the general rule that boats approaching each other are to turn to the right, but further testified: "the only move I could make that day to save seven people, only move I could make there is no doubt in my mind was to turn my boat left. If I had continued my course of action or even gone right I thought he was going to hit us. The only thing I could do is save those lives to save our boat is to move left. It was the only option."

The larger boat passed to the right of Dustin's boat, within approximately 10 feet according to Brian and within three to four feet according to Dustin. Dustin and Kim saw the driver of the boat and identified defendant as the driver. Dustin said the driver "wasn't even looking" when he passed by.

Defendant never slowed down and never changed course. After passing Dustin's boat, defendant drove his boat "right over the top of" Rachael and Robin on the innertube, running "right through the center of them." Defendant did not slow down or turn before hitting the women and he did not stop afterward.

4

James O'Bird was a passenger on defendant's boat at the time. He described defendant's boat as the fastest boat he had ever been on.[4] O'Bird denied driving and said defendant drove the boat. O'Bird had been drinking and smoking marijuana, which was in violation of his parole or probation. At one point, O'Bird noticed that defendant was driving the boat at 55 miles per hour. He then saw another boat, and both boats whipped to the left. The boats missed each other by approximately four feet. O'Bird testified that when those boats both turned, there was just "one split second [he] saw those girls whip around right underneath us on that tube. And I looked back and they were floating face down. And I was like 'dude you just smoked two girls man'. And [defendant] said 'no I didn't'. I was like no seriously I am on parole and I jumped out of the boat."[5] O'Bird testified that defendant did not realize that he had run over the victims.

After defendant drove his boat over the victims, Rachael and Robin, both wearing life preservers, floated "lifelessly," face down in the water. Brian dove in and swam to Rachael. Jeff dove in and swam to Robin. Brian flipped Rachael over and realized that she was not breathing and that her lips were blue. Brian managed to get Rachael onto the back of Dustin's boat, and he began to perform CPR. Robin was also pulled back onto the back of Dustin's boat, and Jeff started performing CPR.

Tim Saito, a firefighter and certified EMT, was off-duty on his boat. At approximately 4:45 p.m., he heard a loud pop, looked in the direction of the noise and saw a boat towing an innertube that looked as though it had been popped. Saito drove his boat towards the scene. As he approached, he saw two women on the boat's swim deck

---

[4] O'Bird further described defendant's boat as "big," called it a cigar boat and stated: "[i]t looked like that Miami Vice boat." Other witnesses also referred to it as a cigar boat. Another referred to it as a cigarette boat and stated it was a "boat made for speed."

[5] Witnesses saw O'Bird jump out of the larger boat and get picked up by another boat. That boat took O'Bird to shore.

with two men, and one of the men was performing CPR on one of the women. Saito jumped off his boat and boarded the other boat to render aid. At different times, Saito checked both Rachael and Robin for a pulse, and, in each case, he did not feel one. People continued to perform CPR on the women. Saito instructed someone to call 911 and notify them that they were going to a particular location on the shore. Once they reached shore, Saito helped transport Rachael off the boat and secure her to a backboard. Eventually, a helicopter arrived and Rachael was loaded onto the helicopter.

Meanwhile, witnesses saw defendant, slumped over on his boat. Officers on shore directed defendant to come ashore. One or more younger males, never identified, boarded defendant's boat and drove it to shore. As the boat approached shore, witnesses saw defendant open a beer and drink most or all of it. One witness testified that when defendant's boat was being brought in, defendant held the beer up in his hand and was "waiving [it] around like in celebration. . . like he thought we were cheering him."

Deputy Tyson McMahon spoke to O'Bird, who confirmed he had been on defendant's vessel, and that defendant had been driving when it struck the victims.

McMahon ordered defendant off his vessel. Defendant stood up, but then fell back onto the seat. Defendant attempted to comply again, but after he stood up, he fell onto the bow of the boat. When defendant again attempted to comply, he fell into the lake. With McMahon's assistance, defendant was able to get to shore. McMahon observed that defendant's speech was slurred and he had an unsteady gait, and McMahon could smell the odor of alcohol on defendant's breath.

Deputy Shawn Cechini also smelled the odor of alcohol on defendant's breath. He observed that defendant's eyes were watery and his speech was slurred. Cechini informed defendant that he was going to conduct field sobriety tests to evaluate whether defendant had been operating his vessel while impaired. Defendant responded that he had not been operating his vessel, and said he did nothing wrong. Cechini advised defendant of his *Miranda* rights and asked if he had been drinking. Defendant responded

6

that he had six Corona Lights, and that he drank his last beer at 4:05 p.m. Cechini asked defendant if he could feel the effects of the alcohol, and defendant replied that he could. However, he also said that because he had been drinking, he had not been operating the vessel. He said someone named Mark was operating the vessel.[6] In performing the three field sobriety tests administered by Cechini, defendant failed to follow instructions and his performance on the tests was indicative of alcohol consumption. Cechini arrested defendant.

At the Calaveras County Sheriff's Department, defendant took a preliminary breathalyzer test. The result was .205 percent. At about 6:55 p.m., blood was drawn from defendant at a hospital. Defendant's blood alcohol content was .238 percent. It was estimated that at 4:45 p.m., defendant's blood alcohol content would have been .278 percent.

During his cross-examination, Cechini, who was a marine safety officer, testified that, when two vessels approach each other head-on, the primary responsibility is to take action to avoid a collision. He also testified that a rule, applicable on Lake Tulloch, provided that, when two vessels approach each other head-on, each is supposed to veer starboard (right) and pass the other on the port side (left). On redirect, Cechini testified that another rule stated that a vessel may take any action necessary to avoid a collision, and thus a vessel is not always required to turn right to avoid a collision.

Tuolumne County Sheriff's Detective Scott Meyer testified that the speed limit on Lake Tulloch was 45 miles per hour. He also testified that, generally, if two vessels are approaching each other head-on, the vessels should pass on the right side, "[s]o you pass port to port." Meyer testified that, even with the right of way, a vessel operator must take all precautions necessary to avoid a collision, even if another vessel is violating an

---

[6] The Attorney General notes that nobody named Mark was ever identified at trial, and defendant did not dispute this.

7

applicable law or rule. After being asked about whether there were specific rules governing vessels towing people on innertubes, Meyer testified that "[y]ou have to have someone over the age of 12 that is watching, keeping an observation and observing, keeping a look-out at all times."[7]

Calaveras County Sheriff's Deputy Greg Stark, a sergeant, testified that, while generally vessels approaching one another head-on should turn to the right, "there are other rules that pertain to doing anything you can to avoid an accident . . . ." "[I]f you see something in front of you, you don't have to turn right you can do what ever you can to avoid that accident specifically slowing your . . . vessel down turning left if you had to. Or completely stopping to make sure there is no accident."

At some point, Cechini recovered from defendant's vessel part of the innertube the victims had been on. It was wrapped around the propeller. Inside defendant's boat, Cechini found beer bottles, both full and empty.

On July 30, 2016, Cechini went to defendant's house to rearrest him. As Cechini drove defendant to the Sheriff's Department, defendant said he wanted to talk to Cechini "man to man. Dean . . . to Shawn." Cechini again advised defendant of his *Miranda* rights. Defendant then began talking to Cechini. He said that "he had regret, he was having remorse and regrets and . . . he started asking a question about if a witness had told us about a wheel being jerked out of his hand or to the right." Defendant acknowledged to Cechini that he had been operating his vessel when it hit the victims and that he had been impaired at the time. He told Cechini he had "great remorse and he wished he could take it back."

---

[7] Detective Meyer also testified that he spoke with Dustin at the scene. Meyer did not smell alcohol and nothing led him to believe that Dustin was under the influence of alcohol or drugs.

A private investigator, Thomas McCarthy, spoke with defendant approximately one month after the incident. McCarthy said he was working for a private law firm, representing one of the victims. McCarthy testified that defendant told him that he had been drinking beer on the day of the incident. Defendant told McCarthy that he had one passenger with him at the time, O'Bird. Defendant said he had been "driving at a pretty good speed," and that "he hadn't noticed anything and when he looked up he noticed another vessel coming straight" at his boat. Defendant claimed he turned to the right to avoid the other vessel, and cleared it by a few feet. He remarked to O'Bird that it "was a close call." Defendant told the investigator that he never saw the innertube and he never saw the victims. Defendant told the investigator: "he went on as normal . . . O'Bird told him that he had run over someone but he refused to accept that and went on." McCarthy did not testify that defendant said anything about the steering wheel being jerked out of his hand by someone else in the boat.

As a result of the collision, Rachael was in a coma for approximately five or six weeks. She suffered neuropathy in her arm and traumatic brain injury. She also suffered fractures to her leg and patella. She suffered a deterioration in her vision. Her memory suffered. She also could not speak as she used to. A treating neurologist opined that Rachel would "never get back to being the same person she was." She had been a spin instructor and very active, and was a mother of young children. Following her recovery from a coma and rehabilitation, she required a cane to walk, had trouble with her vision, and had "a hard time adjusting to her new circumstances." "[B]oth cognitively as well as from her motor perspective walking and emotional state she was having a hard time adjusting . . . ."

Robin had to have a craniectomy to remove a part of her skull to treat a blood clot on her brain that caused a severe amount of pressure. As a result of the blood clot and pressure on her brain, Robin suffered "very large strokes." The treating neurologist opined that Robin would never be independent again. She could walk but was unstable.

9

She did not have much function in her arm on one side. As a result of a stroke she had affecting the left side of her brain, Robin developed a degree of aphasia, resulting in difficulty speaking and understanding speech. In addition to her brain injuries, Robin sustained multiple fractures, including facial and skull fractures, rib fractures, and a leg fracture.

## Defense Evidence

Deputy Joel Burnett testified that he spoke to O'Bird on the day of the collision. O'Bird told him that defendant's boat was traveling at approximately 45 to 50 miles per hour. Burnett testified that O'Bird never told him that he looked at the speedometer and saw the defendant's boat was traveling at 55 miles per hour.

Defendant recalled Cechini. Neither of the people Cechini spoke to who had been on Dustin's boat acknowledged seeing defendant's boat before the time Dustin started waving his arms and screaming. Similarly, Kim told Cechini that the first time she became aware of defendant's boat was when she heard Dustin yelling and screaming.

Defendant recalled McMahon, who testified that he spoke with Jeff on the day of the collision. He described the conversation with Jeff as a "limited conversation." Jeff estimated the speed of defendant's boat at approximately 35 miles per hour or faster.[8] Jeff said he did not see defendant's boat until "[j]ust prior to" the incident and stated he could not identify the boat because it was moving too quickly.

Defendant recalled Meyer who testified that Dustin described the events immediately preceding the incident as follows: "he was tubing between the areas of O'Byrnes Ferry Bridge and the old resort, sort there [*sic*] on Lake Tulloch he was on the right side going away from the bridge towards the resort approximately hundred yards off

---

[8] Jeff denied telling a deputy that defendant's boat was going 35 miles per hour. He testified that defendant's boat was "speeding and going way faster th[a]n you should be going."

10

shore, he said he was going approximately 20 miles an hour he was tubing along he made a left turn in order to go to the center of the channel, he then made in order to get the tube to go outside the wake as the females were riding on the tube he then made a right turn and in a way to force the tube again outside of the wake he said the vessel had slowed during the maneuvers he couldn't remember how fast he was going and that is when he observed another vessel approaching." Dustin told Meyer that it was a matter of seconds between the time he first saw defendant's boat and the impact with the innertube.

<strong>Verdict and Sentencing</strong>

The jury found defendant guilty on count 1, unlawfully operating a vessel while under the influence causing bodily injury, and found all four special great bodily injury allegations to be true. Defendant moved for a new trial based on issues related to causation and the omission of his requested pinpoint instructions that are addressed in part II. of the Discussion, *post*. The trial court denied defendant's motion.

The trial court sentenced defendant to an aggregate term of 12 years, calculated as follows: the midterm of two years on count 1 plus five years consecutive for each section 12022.7, subdivision (b), great bodily injury/comatose enhancement. The court also imposed and stayed three-year terms on each section 12022.7, subdivision (a), enhancement.

<strong>DISCUSSION</strong>

<strong>I. Defendant's Statements to Law Enforcement</strong>

<strong>A. Additional Background</strong>

Defendant gave three statements to law enforcement, the first at the lake after the collision, the second later that day at the jail and the third six days later after he was rearrested on a bail enhancement warrant.

<strong>1. Cechini's Interview with Defendant at Calaveras County Jail</strong>

In addition to the statements defendant made at the lake and the statements he made after he was rearrested that were introduced into evidence at trial, defendant also

11

made statements to Cechini during the evening on the day of the collision at the Calaveras County jail.  In the interview, Cechini informed defendant of his *Miranda* rights and defendant indicated that he understood each of his rights.  The following exchange then occurred:

"Q:     Okay.  Do you wanna talk to me about what happened?

"A:     What happened?

"Q:     Okay.  So this is what we're lookin' at right now.  I already did the investigation for your B- BUI for when I spotted you on your boat driving from the bridge to where the resort is, okay?

"A:     Mm-hm.

"Q:     I have an additional problem here.  Okay?

"A:     What?

"Q:     There's two women that are laying in . . . serious critical condition from injuries of being ran over by a vessel.  I also have witnesses that state you were the person that were operating at the helm when those two ladies were, uh, struck by your vessel.  And these are eye witnesses, okay?  These are the individuals that said to my other workers that you were the person operating the vessel that ran over these two ladies that are now currently laying in critical condition.

"A:     Today?

"Q:     Yes.

"A:     All right.

"Q:     You wanna talk to me about it, man?  No?

"A:     *No.*

"Q:     Okay.  You wanna just have your attorney?

"A:     What am I gonna do?

"Q:     Well I - I was just . . .

"A:     This is craziness.

12

"Q: Okay. Well, I'm just telling you. I've been with you since the time we were at the Tulloch Resort. I just spoke to my partners that are out in the field that have talked to the witnesses . . .

"A: Uh-huh.

"Q: . . . that had witnessed the accident.

"A: I understand.

"Q: And they basically have . . . positively identified you as the person that was operating the vessel that struck those two women.

"A: In the water?

"Q: Mm-hm.

"A: I don't know what to tell you." (Italics added.)

Thereafter, defendant made several statements, including that he had been drinking beer, although he again denied that he was driving the boat when it hit the victims and denied doing anything wrong.

## 2. Defendant's Motion to Suppress

The prosecutor filed a "response to the anticipated defense motion to suppress the Defendant's confession (anticipated *Miranda* motion)." (Bold and Capitalization omitted.) The prosecutor acknowledged that the interview at the jail "may include *Miranda* defective inculpatory statements." However, the prosecutor asserted that the possible violation of defendant's *Miranda* rights "does not appear to be intentional, tactical, coercive, or in bad-faith," and that defendant's statements appeared to be voluntary. The prosecutor stated that, if the court determined that defendant's *Miranda* rights were violated, the prosecution would not be permitted to play the recording in its case-in-chief, but if defendant testified inconsistently at trial, the prosecution would seek to play the recording as impeachment evidence.

Defendant moved to suppress his statements made at the jail as involuntary and in violation of his *Miranda* rights. Defendant emphasized that, when asked if he wanted to

13

talk, he said no, he did not want to talk about the incident, yet Cechini continued to question him, and defendant ultimately made statements. Defendant asserted that those statements, coming after defendant invoked his right not to speak and in the face of continued law enforcement interrogation, were made in violation of his *Miranda* rights and were not voluntary.

### 3. Hearing on Motion to Suppress

Cechini testified at the hearing on the motion to suppress that, when he initially contacted defendant at the lake, he told defendant he was going to evaluate him for operating a vessel while impaired and he gave defendant the *Miranda* warnings. McMahon heard Cechini advise defendant of his *Miranda* rights. McMahon testified that, if defendant had invoked his *Miranda* rights, he "absolutely" would have noted as much in his report, and further testified that there was no such note in his report. Cechini testified that defendant agreed to speak with Cechini. Cechini asked defendant if he had been drinking, and defendant responded that he had six Corona Lights, and that he last had a beer at approximately 4:05 p.m. He stated that he felt the effects of the alcohol, and that is why he had someone named Mark operate his boat.

Cechini later interviewed defendant at the jail after again advising him of his *Miranda* rights. Cechini asked defendant if he wished to speak with him, and defendant shook his head no. Cechini asked defendant if he was saying he did not want to speak with Cechini, and defendant confirmed by saying "no." Cechini again confirmed that defendant told him "no." Cechini testified that he kept talking with defendant, explaining he did so because "[h]e was talking so I allowed him to continue to talk to me."

Cechini further testified at the hearing that, on July 30, six days after the collision, he rearrested defendant on a bail enhancement warrant and placed him in his vehicle for transport to the jail. Defendant asked to speak with Cechini like "Dean talking to Shawn." Cechini again advised defendant of his *Miranda* rights. Defendant told Cechini that he had been impaired operating his boat at the time of the incident. He confirmed he

14

had been the one operating the boat. At some point during the transport, defendant indicated that he had retained counsel.

Cechini testified that defendant told him he had retained counsel at some point after Cechini advised defendant of his *Miranda* rights and after defendant made the statements at issue.

Defendant testified at the hearing and said he told Cechini he had retained counsel while they were on defendant's porch, before the transport. But defendant acknowledged Cechini gave him the *Miranda* admonition in the vehicle. And he testified he talked to Cechini because: "I wanted to let [Cechini] know that I was very remorseful for these two women and what had happened. And I still am."

Following all testimony, defense counsel indicated that "[e]verything is disputed," meaning the statements at the lake, the statements at the jail interview, and the statements on July 30. Defense counsel asserted that the statements were made in violation of *Miranda* and were involuntary, and that the statements on the day of his rearrest, by which time he had retained counsel, were obtained in violation of *Massiah v. United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246] (*Massiah*).

### 4. The Trial Court's Ruling

The trial court found that there was no *Miranda* violation at the lake. The court determined that there was a *Miranda* violation at the jail, but further determined that the statements defendant made at the jail were not coerced "and the officer was merely responding primarily to the questions that were being asked by" defendant. The court therefore concluded that defendant's statements were not involuntary. The court ruled that the statements could not be used in the prosecution's case-in-chief, but they could be used as impeachment evidence. Finally, the court concluded that there was no *Miranda* violation during the drive to jail on July 30, finding that, despite the earlier invocation at the jail and the fact that defendant had retained counsel, he initiated the discussion. The court stated: "The evidence suggests or states that the officer was not aware that he had

15

retained an attorney but even if he had . . . the defendant still retained the ability to voluntarily re-initiate questioning and accordingly the statements made on the 30th . . . will be admitted."

## B. *Miranda*, Voluntariness, and Standards of Review

"Under California law, issues relating to the suppression of statements made during a custodial interrogation must be reviewed under federal constitutional standards." (*People v. Nelson* (2012) 53 Cal.4th 367, 374.)

"The basic rule of *Miranda, supra*, 384 U.S. 436, and its progeny, is familiar: Under the Fifth Amendment to the federal Constitution, as applied to the states through the Fourteenth Amendment, '[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . .' [Citation.] 'In order to combat [the] pressures [of custodial interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights' to remain silent and to have the assistance of counsel. [Citation.] '[I]f the accused indicates in any manner that he wishes to remain silent or to consult an attorney, interrogation must cease, and any statement obtained from him during interrogation thereafter may not be admitted against him at his trial' [citations], at least during the prosecution's case-in-chief." (*People v. Lessie* (2010) 47 Cal.4th 1152, 1162.)

"As long as [a] defendant validly waive[s] the *Miranda* protection and voluntarily confesse[s], the statements are admissible." (*People v. Krebs* (2019) 8 Cal.5th 265, 302 (*Krebs*).) "A valid waiver need not be express, but 'may be implied from the defendant's words and actions.' " (*Ibid*., quoting *People v. Parker* (2017) 2 Cal.5th 1184, 1216.) "When a suspect ' "having heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and intelligently waived them." ' " (*Ibid*.) "It is the prosecution's burden to prove, by a preponderance of the evidence, the accused's rights

16

under *Miranda* were not violated." (*People v. Villasenor* (2015) 242 Cal.App.4th 42, 59 (*Villasenor*).)

" 'On appeal, we review independently the trial court's legal determinations of whether a defendant's . . . *Miranda* waivers were knowingly, intelligently, and voluntarily made [citation], and whether his later actions constituted an invocation of his right to silence [citation]. We evaluate the trial court's factual findings regarding the circumstances surrounding the defendant's statements and waivers, and ' " 'accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence.' " ' " (*Krebs, supra*, 8 Cal.5th at p. 299.)

"Independent of whether a defendant's rights under *Miranda* were observed, his or her statements may not be admitted unless they were voluntary. 'The court in making a voluntariness determination "examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." ' [Citation.] The prosecution bears the burden of proof and must show 'by a preponderance of the evidence the statements were, in fact, voluntary.' " (*Krebs, supra*, 8 Cal.5th at p. 299.)

" 'Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the "totality of [the] circumstances." ' " (*People v. Sapp* (2003) 31 Cal.4th 240, 267.) "Under federal standards, the prosecution 'must demonstrate the voluntariness of a confession by a preponderance of the evidence. [Citations.] California courts use this standard." (*Ibid*.)

### C.  Analysis

#### 1.  Statements at the Lake

Defendant asserts that there was not a complete *Miranda* waiver at the lake. He asserts that there is no evidence concerning any admonition given to him to support the admissibility of his statements at the lake. He also asserts that the record is silent as to how and whether he waived his *Miranda* rights. Defendant emphasizes that McMahon said he heard the admonition, but did not recall defendant agreeing to speak with Cechini,

17

and said that he did not recall defendant's responses. Defendant asserts that a *Miranda* waiver cannot be presumed from a silent record and in the absence of evidence that he actually knew his rights.

At the hearing on defendant's motion to suppress, Cechini testified that he gave defendant the *Miranda* warnings at the lake. McMahon testified that he heard Cechini advise defendant of his *Miranda* rights. Cechini specifically testified that he advised defendant of his right to remain silent, his right to an attorney, and that if he could not afford an attorney, one would be appointed for him. As the Attorney General implicitly acknowledges, Cechini did not testify that he advised defendant that anything he said could be used against him in court. According to Cechini, defendant agreed to speak with him, and went on to make a number of statements.

Aside from the defective *Miranda* admonition omitting the admonition that anything defendant said could be used against him in court, the record is silent on whether he said he understood his rights. Neither Cechini nor McMahon testified at the hearing that defendant indicated that he said he understood his rights. Defendant testified at the hearing, but nothing in his testimony would establish that he understood his rights. Moreover, there are no surrounding circumstances from which we could reasonably infer that defendant understood his rights.

Because the warning was defective and the record is silent as to whether defendant understood his rights, the trial court erred in determining that the statements defendant made at the lake were admissible. (*Miranda, supra*, 384 U.S. at p. 498 [a knowing and intelligent waiver cannot be presumed on a silent record]; accord, *People v. Lilliock* (1965) 62 Cal.2d 618, 622; see also *People v. Combs* (2004) 34 Cal.4th 821, 845.) We shall discuss prejudice in part I.E. of the Discussion, *post*.

### 2. Statements at the Jail

The Attorney General concedes that Cechini should have stopped questioning defendant after defendant responded "no" when asked if he wanted to talk, and that the

18

continued interview at the jail constituted a *Miranda* violation. Indeed, as the Attorney General notes, the trial court and the prosecutor agreed with defendant that he invoked his rights toward the beginning of the interview at the jail. We agree — defendant invoked his right to remain silent by answering "no" to the question of whether he wanted to talk to Cechini.

Defendant asserts that the statements he made at the jail, after invoking his *Miranda* rights and indicating that he did not wish to speak with Cechini, were involuntary. The statements defendant made at the jail were not admitted during the prosecution's case-in-chief. Further, defendant did not testify, and thus these statements were not admitted to impeach defendant's testimony.

However, the exchange at the jail, and defendant's invocation of his right to remain silent, are relevant to the admissibility and voluntariness of his subsequent, July 30, statements. "When the police violate a suspect's *Miranda* rights, the statement immediately resulting from that violation is inadmissible in the prosecution's case-in-chief. [Citation.] That violation may also warrant suppression of subsequent statements obtained as a result of the initial violation. [Citation.] However, because a violation of *Miranda* does not necessarily result in a confession that is 'compelled' within the meaning of the Fifth Amendment [citations], an initial *Miranda* violation does not 'inherently taint[ ]'—and thus warrant suppression of—all subsequent statements [citation]. Instead, a defendant seeking to suppress a statement as the tainted fruit of a *Miranda* violation *must establish that any subsequent confession was involuntary*. [Citations.] We adjudge whether a confession was voluntary by looking to the totality of the circumstances." (*People v. Orozco* (2019) 32 Cal.App.5th 802, 817-818, italics added.)

### 3. Statements After Defendant's Rearrest

Defendant asserts that the continued questioning by Cechini on July 30, after he had invoked his *Miranda* rights on July 24, violated his Fifth Amendment right to remain

19

silent. Defendant emphasizes that not only had he invoked his rights on the last occasion he was in custody, but he had also retained counsel. Cechini nonetheless simply purported to secure a new waiver. This, according to defendant, establishes both a violation of defendant's prior *Miranda* invocation and a violation of his right to counsel, relying principally on *Massiah, supra*, 377 U.S. 201.

Inasmuch as defendant asserts that, at the jail on July 24, 2016, he invoked his *Miranda* right to counsel, we disagree. (See generally *People v. DeLeon* (1994) 22 Cal.App.4th 1265, 1269 ["*Miranda* delineates two separate rights-the right to remain silent, and the right to have counsel present during interrogation"].) Defendant invoked his right to remain silent, but did not invoke his right to counsel at that time.

Unlike an invocation of the right to counsel (see *Edwards v. Arizona* (1981) 451 U.S. 477, 484-485 [68 L.Ed.2d 378, 386-387] [*Edwards*]), a suspect's invocation of the right to remain silent does not create "a per se proscription of indefinite duration upon any further questioning by [the] police." (*Michigan v. Mosley* (1975) 423 U.S. 96, 102-103 [46 L.Ed.2d. 313, 321] (*Mosley*).) Instead, if questioning is resumed, the court must determine, under the totality of circumstances, whether the suspect's right to cut off questioning had been " 'scrupulously honored.' " (*People v. Warner* (1988) 203 Cal.App.3d 1122, 1129-1130 (*Warner*), quoting *Mosley*, at p. 104.)

Here, when Cechini went to rearrest defendant on a bail enhancement warrant, six days had passed since defendant invoked his right to remain silent. Cechini arrived at defendant's home, executed the warrant, and placed defendant in his vehicle for transport to the jail. Defendant asked to speak with Cechini "like Dean talking to Shawn." Cechini again advised defendant of his *Miranda* rights. On recross-examination, the prosecutor asked Cechini: "After you advised the defendant of the Miranda rights while you were driving on the 30th did he say something to the effect he understood all that, he just wanted to talk to you?" Cechini replied: "Yes." Defendant then made a number of statements. Under these circumstances, we conclude that, after the July 24 interview at

20

the jail, defendant's right to cut off questioning was indeed " 'scrupulously honored.' " (*Warner, supra*, 203 Cal.App.3d at pp. 1129-1130, quoting *Mosley, supra*, 423 U.S. at p. 104.) Indeed, Cechini did not question defendant during the encounter six days later; rather, defendant chose to make unsolicited statements to Cechini.

With regard to defendant's Sixth Amendment right to counsel, as the Attorney General acknowledges, this right had attached two days before July 30, when the prosecution filed a criminal complaint against defendant. However, "the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent. [Citations.] The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled. [Citation.] And when a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick, even though the *Miranda* rights purportedly have their source in the Fifth Amendment: [¶] 'As a general matter . . . an accused who is admonished with the warnings prescribed by this Court in *Miranda* . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one.' " (*Montejo v. Louisiana* (2009) 556 U.S. 778, 786-787 [173 L.Ed.2d 955, 963] (*Montejo*).)

At the time defendant volunteered his statements in Cechini's vehicle, he had waived his right to counsel. Before the volunteered statements, Cechini had once again advised defendant of his *Miranda* rights and defendant indicated that he understood. Given the waiver, it does not matter that defendant was represented by counsel at that time. (*Montejo, supra*, 556 U.S. at p. 786.)

Furthermore, because defendant volunteered the statements on July 30, his right to remain silent and to counsel were not violated. Even when a defendant has expressed his desire to deal with the police only through counsel, statements made after " ' "the

21

accused himself initiates further communication, exchanges, or conversations with the police" ' " are admissible. (*People v. Mattson* (1990) 50 Cal.3d 826, 859, quoting *People v. Boyer* (1989) 48 Cal.3d 247, 273, italics omitted.) " ' "An accused 'initiates' " further communication, exchanges, or conversations of the requisite nature "when he speaks words or engages in conduct that can be 'fairly said to represent a desire' on his part 'to open up a more generalized discussion relating directly or indirectly to the investigation.' " ' " (*People v. Gamache* (2010) 48 Cal.4th 347, 384-385.)

According to Cechini's hearing testimony, which the trial court credited, defendant initiated all substantive conversation in Cechini's vehicle on July 30, beginning that conversation by saying he wanted to speak to Cechini "like Dean talking to Shawn." After Cechini advised defendant of his *Miranda* rights and defendant indicated he understood, defendant then volunteered the subject statements. Once defendant initiated such further conversations, " 'the police may commence interrogation if [defendant] validly waives his [*Miranda*] rights.' " (*People v. Mickey* (1991) 54 Cal.3d 612, 649; accord, *Edwards, supra*, 451 U.S. at p. 486, fn. 9.)

Moreover, defendant's statements on July 30, 2016, were voluntary. Defendant initiated this discussion. Cechini advised defendant of his rights, defendant indicated he understood, and then defendant volunteered statements. It cannot be said that " ' " 'defendant's will was overborne' by the circumstances surrounding the giving of a confession." ' " (*Krebs, supra*, 8 Cal.5th at p. 299.) Indeed, the noncoercive nature of the statements is evidenced by the fact that the statements were largely self-serving.

Thus, we conclude the trial court did not err in ruling that the July 30 statements were admissible, as they were not admitted in violation of defendant's rights under *Miranda* or the Sixth Amendment, and they were not involuntary.

### D. Harmless Error

The Attorney General asserts that any error in the admission of defendant's statements was harmless beyond a reasonable doubt.

"The erroneous admission of statements obtained in violation of *Miranda* is reviewed for prejudice pursuant to *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] [(*Chapman*)], under which we inquire whether the error may be deemed harmless beyond a reasonable doubt." (*Villasenor, supra*, 242 Cal.App.4th at pp. 68-69.) The erroneous admission of statements in violation of a defendant's Sixth Amendment rights is likewise subject to a harmless error analysis under *Chapman*. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681 [89 L.Ed.2d 674, 684-685].) To determine whether the People have satisfied their burden of proving the error was harmless beyond a reasonable doubt, "we examine the entire record and must reverse if there is a ' " 'reasonable possibility' " ' that the error contributed to the verdict." (*People v. Reese* (2017) 2 Cal.5th 660, 671 (*Reese*), citing *People v. Aranda* (2012) 55 Cal.4th 342, 367 (*Aranda*).)

As we have noted, defendant's statements at the lake should have been suppressed. At trial, Cechini testified that, at the lake, he asked defendant if he had been drinking, and defendant responded that he had six Corona Lights, and that he drank his last beer at 4:05 p.m. Cechini asked defendant if he could feel the effects of the alcohol, and defendant replied that he could. Defendant denied that he had been operating the boat and instead claimed some person named Mark had done so when the victims were struck.

Ultimately, other trial evidence established that defendant had been drinking, that he was intoxicated and had an excessively high blood alcohol level, that he was operating his boat when it struck the victims, and that it was not some third person named Mark who had been operating the boat. And these points were not contested by the defense.

Regarding defendant's lack of sobriety, when Deputy McMahon ordered defendant off his boat, defendant stood up, but then fell back onto the seat. Defendant stood up again and then fell onto the bow of the boat. When defendant stood up again, he fell into the lake. After fishing defendant out of the water, McMahon observed that defendant's speech was slurred and he had an unsteady gait, and McMahon could smell

23

the odor of alcohol on defendant's breath. Cechini also smelled the odor of alcohol on defendant's breath. He also noticed that defendant's eyes were watery and his speech was slurred. Defendant failed the three field sobriety tests Cechini administered. Defendant's performance on the field sobriety tests administered by Cechini was indicative of alcohol consumption. Additionally, defendant's breath alcohol test and blood alcohol test established defendant's level of intoxication, although defense counsel's cross-examination of the criminalist who testified about these tests suggested that the precise level of defendant's intoxication at the time of the incident could be difficult to fix because defendant drank at least one beer after the incident.

As for the identity of the driver, independent of defendant's statement to Cechini, multiple eyewitnesses identified defendant as the individual operating the boat when it struck the victims. And defendant admitted he was driving the boat — "at a pretty good speed" — when he spoke to the McCarthy, the private investigator. He also admitted to McCarthy that he never saw the innertube, never saw the victims, continued on as normal after narrowly missing the other boat, and refused to accept O'Bird's statement that he had run over someone.

Moreover, even if we deemed it error to admit the statements defendant made to Cechini on July 30 while they were driving to the jail after Cechini rearrested him, we would conclude any such error was harmless beyond a reasonable doubt. In those statements, defendant admitted that he had been operating his boat when he struck the victims, and that he had been intoxicated at the time, matters he did not contest at trial and which were overwhelmingly established by other evidence. With regard to his additional statements that someone jerked the steering wheel and that he had "great remorse and he wished he could take it back," there is no reasonable possibility that the admission of these statements, which were self-serving and portrayed defendant in a more sympathetic light, contributed to the verdict. (*Reese, supra*, 2 Cal.5th at p. 671; *Aranda, supra*, 55 Cal.4th at p. 367; see *Chapman, supra*, 386 U.S. at pp. 23-24.) As for

24

the falsity of the statement about the steering wheel being jerked, defendant's credibility was already tarnished given that it was at odds with the other evidence, including the statement he made to the private investigator.

Thus, the admission of the statements to law enforcement was harmless beyond a reasonable doubt because there is no " ' " "reasonable possibility' " ' that the error contributed to the verdict." (*Reese*, *supra*, 2 Cal.5th at p. 671; *Aranda*, *supra*, 55 Cal.4th at p. 367; see *Chapman*, *supra*, 386 U.S. at pp. 23-24.)[9]

## II. Refusal to Give Defendant's Proposed Instructions[10]

### A. Additional Background

### 1. Defendant's Requested Instructions and the Trial Court's Ruling

Defendant submitted several proposed instructions, including U.S. Inland Navigations Rule 14 (Rule 14) regarding the head-on situation, Harbors and Navigation Code section 658, CACI No. 411, CALCRIM No. 3404, and an additional proximate cause instruction quoting language from *People v. Cervantes* (2001) 26 Cal.4th 860 (*Cervantes*). The prosecution filed a written objection to defendant's requests. Among other things, the prosecutor asserted that, in the absence of other instruction on other rules, including Rule 2(b), Rule 14 would lack sufficient context. He argued CALCRIM No. 2100 adequately instructed the jurors on causation.

---

[9] Defendant appears to concede he was not prejudiced. In his reply brief, defendant states: "Appellant believes that even if error is established on the admissibility of two of the statements, Appellant does not believe the admission of those statements created a 'miscarriage of justice' and would therefore be harmless error. Because these statements do not relate to how the accident happened, Appellant makes no further reply concerning the admissibility of his statements."

[10] Defendant characterizes this as "by far" his strongest argument, particularly in "a case where the defendant conceded intoxication in driving of a boat . . . ." Defendant states that the only genuine issue before the jury "was whether the defendant was responsible for the collision between his boat and the two tubers being drawn behind [Dustin's] boat." (Capitalization omitted.)

The trial court found defendant's proposed instructions inapplicable. The court stated: "There is no charge here with regard to Harbors and Navigation or any of these rules. It would be inappropriate to instruct them on this. [¶] The evidence that the defense is propounding to argue the point that the defendant's actions in this matter weren't a substantial factor. That the actions of the ski boat [Dustin's boat] were the substantial factor. [¶] So to give you a tentative on this I think it's not appropriate. It's going to get far too confusing to even if the Court were to consider it to give these instructions because they do not apply to the law and issue in this case."

Defense counsel argued that the instructions were necessary to consider "whether the conduct of [Dustin's] boat is foreseeable or not. If it's in clear violation of regulations, but it contained on the rules that they have to operate their boat by, the jury should be told that the people in the jet ski boat were violating a number of rules . . . ." The court emphasized that defense counsel could argue to the jury that Dustin's boat was in violation of rules based on the testimony.

Discussing CACI No. 411, the court stated: "the way the Court analyzes 411, is that jury instructions are designed to assist the jury in their decision making process. And I don't see where that assists [the jury] in any way. Because you have every person has the right to expect that the other person will take reasonable care. . . . So your position is that these people should have been operating more appropriately and seeing him coming. [The prosecutor] is going to be saying people shouldn't be driving drunk. . . . [T]here is nothing there that enlightens --." The court continued: "I don't see 411 as contributing anything that is going to assist this court. You have the proximate cause and you are right too, you are entitled to proximate cause bench notes cases supporting that. It's in CALCRIM No. 2100. That is what, there may be more than one cause of injury and that cause of bodily injury to another person only if it is a substantial factor in causing the injury. A substantial factor is more th[a]n a trivial or remote factor. However it need not

26

be the only factor that causes the injury. And that is the proximate cause instruction here."

### 2. CALCRIM No. 2100

Both before and after the presentation of evidence, the trial court instructed the jury with CALCRIM No. 2100, in pertinent part, as follows:

"The Defendant is charged with causing injury to another person while operating a vessel under the influence of an alcoholic beverage in violation of Harbors and Navigations Code 655(f). [¶] To prove that the Defendant is guilty of this crime, the People must prove that: [¶] 1. The Defendant operated a vessel; [¶] 2. When he operated a vessel, the Defendant was under the influence of an alcoholic beverage; [¶] 3. While operating a vessel under the influence, the Defendant also committed an illegal act or neglected to perform a legal duty; [¶] AND [¶] 4. The Defendant's illegal act or failure to perform a legal duty caused bodily injury to another person. [¶] . . . [¶] The People allege that the Defendant failed to perform the following legal duties while operating the vessel: the duty to exercise ordinary care at all times and to maintain proper control of the vessel. [¶] Using ordinary care means using reasonable care to prevent reasonably foreseeable harm to someone else. A person fails to exercise ordinary care if he or she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation. [¶] An act causes bodily injury to another person if the injury is the direct, natural, and probable consequence of the act and the injury would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence. [¶] There may be more than one cause of injury. *An act causes bodily injury* to another person only *if it is a substantial factor* in causing the injury. A

27

substantial factor is more than a trivial or remote factor. However, *it need not be the only factor that causes the injury*." (Italics added.)

## B. Defendant's Contentions

Defendant asserts that the trial court erred in refusing to give his requested jury instructions which were relevant to causation. Defendant asserts that the proposed instructions were necessary for the jury to understand the rules applicable to the two boats. Defendant asserts that the instructions were necessary for the jury to determine whether Dustin's boat caused the collision and whether its operation was an intervening, superseding cause of the injuries. We disagree.

## C. The Trial Court's Instructional Duty

"A trial court has a sua sponte duty to 'instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case . . . .' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 845-846, quoting *People v. Carter* (2003) 30 Cal.4th 1166, 1219.) "Pinpoint instructions ' "relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case." ' [Citation.] 'Upon proper request, a defendant has a right to an instruction pinpointing the theory of defense . . . if the theory proffered by the defendant is supported by substantial evidence' [citation], the instruction is a correct statement of law [citation], and the proposed instruction does not simply highlight specific evidence the defendant wishes the jury to consider." (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1173-1174 (*Jo*).) "The trial court may properly refuse an instruction highlighting a defense theory if it is 'duplicative or potentially confusing.' [Citation.] '[W]here standard instructions fully and adequately advise the jury upon a particular issue, a pinpoint instruction on that point is properly refused.' [Citations.] Put another way, '[t]here is no error in a trial court's failing or refusing to instruct on one matter, unless the remaining instructions, considered as a whole, fail to cover the material issues raised at trial.' [Citation.] The failure to give an instruction on even an essential issue 'may be cured if the essential material is covered by

28

other correct instructions properly given.' " (*Id*. at p. 1174; accord, *People v. Moon* (2005) 37 Cal.4th 1, 30 (*Moon*) ["a trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence"].)

### D.  Analysis

#### 1.  Navigation Rules

##### a.  Rule 14

Rule 14 provides, in pertinent part:  "Unless otherwise agreed, when two power-driven vessels are meeting on reciprocal or nearly reciprocal courses so as to involve risk of collision each shall alter her course to starboard so that each shall pass on the port side of the other." (33 C.F.R. § 83.14(a) (2019).)

Defendant's theory of the case rested on the premise that the collision of his boat with the victims on the innertube was the result not of his boating under the influence or failing to exercise reasonable care, but instead of the failures of Dustin and his passengers to adhere to applicable boating rules, which served as an independent superseding cause of the incident.  It was not disputed at trial that, upon observing defendant's vessel approaching his boat at a high rate of speed, Dustin turned left to avoid a collision.

We conclude that the trial court should have granted defendant's request to instruct the jury with Rule 14.  Defendant's theory was supported by substantial evidence, the requested instruction would have been a correct statement of law, and instructing the jury with Rule 14 would not have simply highlighted evidence that defendant wanted the jury to consider.  (*Jo, supra*, 15 Cal.App.5th at p. 1174.)  We do not agree with the trial court's conclusion that, because defendant was not charged with a violation of Rule 14, or that violation of Rule 14 was not an element of the offense with which he was charged, the instruction was inapplicable.  As stated, the instruction was relevant to his defense and was supported by substantial evidence.  However, as we will discuss *post*, the error was harmless.

### b. Harbors and Navigation Code Section 658, Subdivision (d)

Harbors and Navigation Code section 658, subdivision (d) provides: "No person shall operate or manipulate any vessel, towrope, or other device by which the direction or location of water skis, an aquaplane, or a similar device may be affected or controlled so as to cause the water skis, aquaplane, or similar device, or any person thereon, to collide with, or strike against, any object or person." For essentially the same reasons as those discussed in relation to Rule 14, this subdivision would be relevant to defendant's theory that the incident was caused by Dustin's violation of boating rules, which purportedly endangered the victims. Substantial evidence supported this defense theory. Accordingly, we conclude that the trial court should have instructed the jury with subdivision (d).[11]

### c. Harbors and Navigation Code Section 658, Subdivision (a)

Harbors and Navigation Code section 658, subdivision (a), provides, in pertinent part: "No person shall operate a vessel on any waters for towing a person or persons on water skis, an aquaplane, or a similar device unless there is in the vessel a person at least 12 years of age, in addition to the operator, in a position to observe the progress of the persons being towed."

---

[11] The parties also mention Harbors and Navigation Code section 658, subdivision (e). However, that subdivision addresses the operation of "water skis, an aquaplane, or a similar device" rather than the operation of a vessel. Thus, this subdivision would apply to a circumstance addressing the way in which the innertube itself was operated, as opposed to the vessel towing it. (*Ford v. Gouin* (1992) 3 Cal.4th 339, 350 ["section 658, subdivision (d), imposes a duty on the *operator of the vessel* not to cause a collision between the person towed and 'any object or person.' Subdivision (e) of section 658 imposes a corresponding duty on the *water-skier* not to 'endanger the life, limb or property of any person.' "].) There are no allegations in this case about how the victims operated the innertube or even if it was capable of operation by the victims. The relevant issues here relate to Dustin's operation of his vessel.

30

Substantial evidence did not support any theory that the incident was caused in any part by the fact that there was no adult in a position to observe the people being towed. Kim, Brian, and Jeff were all in a position to observe the people being towed. And although the statute calls for nothing more than an adult, other than the operator to be *in a position to observe*, there was evidence that an adult was actually observing. Dustin testified that Kim was the lookout, and that she had a yellow or orange flag with her at all times. Kim testified that she was on the boat with Dustin frequently, and serves as a lookout "as a matter of course."

"In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt . . . .' " (*People v. Salas* (2006) 37 Cal.4th 967, 982-983 (*Salas*).) Here, there was no evidence which, if believed by the jury, would have established that there was no one on Dustin's boat in a position to observe the people being towed. Moreover, there is no evidence, or theory advanced, to the effect that the collision was caused by the failure of a lookout "*in a position to observe the progress of the persons being towed*." (Harb. & Nav. Code, § 658, subd. (a).) Defendant's theory included the failure of a lookout on Dustin's boat alert to other vessels, specifically vessels approaching the bow of Dustin's boat. But the statute does not require that there be a lookout, let alone one that has a duty to alert other vessels. Moreover, someone charged with observing the progress of the victims on the innertube would be looking in the opposite direction, towards the stern of Dustin's boat. Moreover, there was no evidence that, even if Kim or the other passengers did not satisfy the requirement of Harbors and Navigation Code section 658, subdivision (a), there was anything any such person could have done to prevent the injuries inflicted by defendant.

Substantial evidence did not support the defense theory that the collision occurred because of the absence of anyone in a position to observe the people on the innertube,

31

and thus an instruction based on subdivision (a) of Harbors and Navigation Code section 658 was properly denied.

## 2. CACI No. 411

CACI No. 411 provides: "Every person has a right to expect that every other person will use reasonable care [and will not violate the law], unless he or she knows, or should know, that the other person will not use reasonable care [or will violate the law]."

For the reasons stated in *People v. Elder* (2017) 11 Cal.App.5th 123 (*Elder*), on which the Attorney General relies, we conclude the trial court properly declined to instruct the jury with CACI No. 411. The court in *Elder* stated: "Contrary to defendant's argument that the instruction was necessary to adequately acquaint the jury with the law of causation, CACI No. 411 is not a causation instruction. Titled 'Reliance on Good Conduct of Others,' it is a pattern jury instruction *designed for use in civil negligence cases involving a plaintiff suing a defendant for failing to prevent harm caused by a third party*. The principle it espouses is essentially that a defendant will not be liable for harm caused by a third party's negligent or criminal conduct, unless the third party's conduct was foreseeable: . . . [¶] Defendant's request to instruct the jury on this principle of civil negligence law was particularly inapposite given that another party's contributory negligence is not a defense to criminal liability. [Citation.] The requested instruction would have served only to confuse the jury regarding the relevant issues." (*Elder*, at p. 135, fn. omitted, italics added.) We conclude the same holds true here.

## 3. CALCRIM No. 3404 – Accident

As proposed by defendant, CALCRIM No. 3404 would have read: "The defendant is not guilty of boating under the influence if he acted [or failed to act] without the intent required for that crime, but acted instead accidentally. You may not find the defendant guilty of boating [under the influence] unless you are convinced beyond a reasonable doubt that he acted with the required intent."

CALCRIM No. 3404 relates to mens rea. "The accident defense is a claim that the defendant acted without forming the mental state necessary to make his actions a crime." (*People v. Gonzales* (1999) 74 Cal.App.4th 382, 390, disapproved on another ground in *People v. Anderson* (2011) 51 Cal.4th 989, 998, fn. 3; accord, *People v. Lara* (1996) 44 Cal.App.4th 102, 110.) It arises from section 26 which identifies classes of persons who are not legally deemed capable of committing crimes, including "[p]ersons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, *or culpable negligence*." (*Anderson*, at p. 996, Italics added.)

Here, defendant was charged with violation of Harbors and Navigation Code section 655, subdivision (f), which is not just boating under the influence as set forth in defendant's proposed CALCRIM No. 3404, but rather boating under the influence causing injury. To prove defendant's guilt, the prosecution was required to prove: (1) defendant operated a vessel; (2) when he operated the vessel, he was under the influence of alcohol; (3) while operating the vessel under the influence of alcohol, defendant also committed an illegal act or *neglected to perform a legal duty*; and (4) defendant's illegal act or failure to perform a legal duty caused bodily injury to another person. (Harb. & Nav. Code, § 655, subd. (f); CALCRIM No. 2100, italics added.)

Under the theory advanced by the prosecution, it had to prove that defendant neglected to perform a legal duty — "the duty to exercise ordinary care at all times and to maintain proper control of the vessel." Assuming that CALCRIM No. 3404 is relevant to this element, we proceed to consider whether substantial evidence supported the instruction.[12]

---

[12] The prosecution had the burden of proving that defendant operated his vessel and that he did so under the influence of alcohol. Accident has no bearing on these matters here;

33

Immediately before the collision, Dustin saw defendant driving his boat very fast, what Dustin described as "violent fast" and "[e]xtremely fast," perhaps 60 miles per hour or more. Another witness testified that defendant's boat was "going very fast," and another testified that the boat was going too fast for the size of the lake. O'Bird, defendant's passenger, testified that defendant was driving his boat at 55 miles per hour. Detective Meyer testified that the speed limit on Lake Tulloch was 45 miles per hour. Brian saw the much larger boat speeding directly towards Dustin's boat, and testified that the operator was not looking at Dustin's boat. To avoid a head-on collision, Dustin turned to the left; otherwise, defendant's boat would have "split us in half." Defendant's boat passed within three to 10 feet of Dustin's boat. Defendant never slowed down and never changed course. After passing Dustin's boat, defendant, who was intoxicated, drove his boat "right over the top of" Rachael and Robin, running "right through the center of them." Defendant did not slow down or turn before hitting the women and it did not stop afterward. O'Bird said to defendant, " 'dude you just smoked two girls man,' " and defendant's response was: " 'no I didn't.' " O'Bird testified that defendant did not realize that he had run over the victims.

These facts demonstrate that defendant was not operating his vessel in a lawful manner and that he acted with culpable negligence, which precludes an accident defense. There was no substantial evidence to support a theory that defendant's conduct was the result of accident instead of culpable negligence.

Defendant points to Deputy McMahon's testimony that when he spoke with Jeff on the day of the incident, Jeff estimated the speed of defendant's boat at approximately 35 miles per hour *or faster*. Jeff denied telling a deputy that defendant's boat was going 35 miles per hour and testified that the boat was going "way faster" than it should have

---

there is no contention that defendant accidentally operated his vessel, or that he accidentally operated his vessel while under the influence.

been. Again, speeds in excess of 45 miles per hour would have constituted speeding on Lake Tulloch. While we do not consider the credibility of witnesses in determining whether substantial evidence supported an instruction on a defense, and "instead leaving credibility determinations for the jury" (*People v. Elize* (1999) 71 Cal.App.4th 605, 615), even if there was arguably substantial evidence to support the conclusion that defendant was not speeding, there was not substantial evidence to refute the evidence that defendant otherwise operated his vessel in an unlawful manner and with culpable negligence. Specifically, there was no evidence to contradict the evidence demonstrating that defendant, who was under the influence, drove his vessel directly at Dustin's, that he never looked at Dustin's vessel, that he never slowed down or changed his course, that he passed Dustin's vessel within, at most, 10 feet and only because Dustin turned his vessel out of the path of defendant's, that defendant then drove over the two victims on the innertube, and that defendant did not stop after driving his boat over them despite being told that he had done so. There is not substantial evidence to support defendant's theory of accident on the ground that his actions did not constitute culpable negligence.

Moreover, as the Attorney General asserts, to prove a violation of Harbors and Navigation Code section 655, subdivision (f), the prosecution is not required to prove intent to cause injury. The prosecution did not have to prove that defendant deliberately struck the victims or deliberately caused the collision, a requirement for which CALCRIM No. 3404 could potentially be relevant. Defendant asserts in his reply brief that he "requested [CALCRIM No.] 3404 on 'accident' which would have allowed the jury to understand that sometimes collisions occur and the person being prosecuted is not the cause of the collision, but rather, at the very least, this collision could have been an 'accident.'" Defendant's argument confuses mens rea with causation. CALCRIM No. 3404 is addressed to defendant's mental state, not what caused the collision or injury.

Because there is no substantial evidence supporting CALCRIM No. 3404 on accident, the trial court properly declined to instruct the jury with it.

35

### 4. Proposed Causation Instruction Based on *Cervantes*

Defendant asserts the trial court erroneously refused to give his requested pinpoint instruction on Dustin's conduct as an intervening, superseding cause. His proposed pinpoint instruction was a quote straight from the opinion in *Cervantes, supra*, 26 Cal.4th at page 871. As proposed by defendant, the instruction would have read: "The principles derived from these and related authorities have been summarized as follows. 'In general, an "independent" intervening cause will absolve a defendant of criminal liability. [Citation.] However, in order to be "independent" the intervening cause must be "unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." [Citation.] On the other hand, a "dependent" intervening cause will not relieve the defendant of criminal liability. "A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability. [Citation.] '[ ] The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. [ ] The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act.' " ' [¶] However, a possible consequence is not an intervening cause which involves illegal or conduct contrary to applicable rules."[13]

---

[13] In *Cervantes*, the defendant was "a member of a street gang, who perpetrated a nonfatal shooting that quickly precipitated a revenge killing by members of an opposing street gang." (*Cervantes, supra*, 26 Cal.4th at p. 863.) Our Supreme Court reversed the defendant's conviction for second degree murder under the provocative act doctrine, finding insufficient evidence of proximate causation. The court reasoned that "the actual murderers were not responding to defendant's provocative act." Instead, they " 'intend[ed] to exploit the situation created by [the defendant], but [were] not acting in concert with him,' a circumstance that is 'normally held to relieve the first actor

The principles in *Cervantes*, relating to intervening superseding causes, are incorporated in CALCRIM No. 2100. Among other things, CALCRIM No. 2100, as given by the court, provided: "An act causes bodily injury to another person if the injury is the direct, natural, and probable consequence of the act and the injury would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. . . . [¶] There may be more than one cause of injury. An act causes bodily injury to another person only if it is a substantial factor in causing the injury. A substantial factor is more than a trivial or remote factor. However, it need not be the only factor that causes the injury."

The foregoing language from CALCRIM No. 2100, which defendant does not assert is an inaccurate statement of the law, is essentially identical to language in CALCRIM No. 240, a standalone instruction on causation.[14] It has been held that CALCRIM No. 240 "correctly indicates, in essence, that liability would not be cut off for an intervening act if the victim's injury was nevertheless a 'direct, natural, and probable

---

[defendant] of criminal responsibility.' " (*Id*. at pp. 872-874.) The facts in *Cervantes* are obviously nothing like what happened here.

[14] CALCRIM No. 240 reads: "An act [or omission] causes (injury/_____ *<insert other description>*) if the (injury/_____ *<insert other description>*) is the direct, natural, and probable consequence of the act [or omission] and the (injury/_____ *<insert other description>*) would not have happened without the act [or omission]. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence. [¶] *<Give if multiple potential causes.>* [¶] [There may be more than one cause of (injury/_____ *<insert other description>*). An act [or omission] causes (injury/_____ *<insert other description>*), only if it is a substantial factor in causing the (injury/_____ *<insert other description>*). A substantial factor is more than a trivial or remote factor. However, it does not have to be the only factor that causes the (injury/_____ *<insert other description>*).]" The trial court here elected against instructing the jury with CALCRIM No. 240 because it would have been duplicative the language incorporated in CALCRIM No. 2100.

consequence' of defendant's original act." (*People v. Fiu* (2008) 165 Cal.App.4th 360, 372 (*Fiu*) [discussing CALJIC No. 3.40].) This language "requiring an injury . . . to be a direct, natural and probable consequence of a defendant's act necessarily refers to consequences that are reasonably foreseeable." (*Ibid.*) Moreover, CALCRIM Nos. 240 and 2100 define a "natural and probable consequence" as "one that a reasonable person would know is likely to happen if nothing unusual intervenes." Further, while explaining that there may be more than one cause of injury, the language of these instructions specifies that an act causes injury "only if it is a substantial factor in causing" the injury, and provides that a substantial factor "is more than a trivial or remote factor." By instructing the jury with the relevant language of CALCRIM No. 2100 here, the trial court implicitly instructed on the principle of independent intervening causation.

The court in *Fiu* rejected the defendant's contention that the trial court was required to instruct on supervening cause sua sponte. The court determined that the trial court's CALJIC Nos. 3.40 and 3.41 instructions, which contain language similar to that in CALCRIM Nos. 240 and 2100, was a correct statement of the law of causation.[15] (*Fiu, supra*, 165 Cal.App.4th at pp. 369-373; see also *People v. Bland* (2002) 28 Cal.4th 313, 338 [CALJIC Nos. 3.40 & 3.41 "correctly define proximate causation"].) The language

---

[15] CALJIC No. 3.40, as discussed in *Fiu*, provided: " 'To constitute the crime of Murder or Manslaughter there must be in addition to a death of a human being an unlawful [act] [or] [omission] which was a cause of that death. [¶] The criminal law has its own particular way of defining cause. A cause of death is an [act] [or] [omission] that sets in motion a chain of events that produces *as a direct, natural and probable consequence* of the [act] [or] [omission] the death in question and without which the death would not occur.' " (*Fiu, supra*, 165 Cal.App.4th at p. 369.) CALJIC No. 3.41, as discussed in *Fiu*, provided: " 'There may be more than one cause of death. When the conduct of two or more persons contributes concurrently as a cause of death, the conduct of each is a cause of the death if that conduct was also *a substantial factor* contributing to the result. A cause is concurrent if it was operative at the moment of the death and acted with another cause to produce the death.' " (*Fiu*, at p. 369, second italics added.)

in CALCRIM No. 240, and the relevant language in CALCRIM No. 2100, could be said to be equivalent to the combination of the predecessor instructions, CALJIC Nos. 3.40 and 3.41. We conclude the language of CALCRIM No. 2100 given here adequately instructed the jury on the doctrine of superseding cause.

Because the trial court instructed the jury with the relevant language of CALCRIM No. 2100, which adequately and accurately instructed the jury on causation, the trial court did not abuse its discretion in declining defendant's proposed pinpoint causation instruction quoting the language of *Cervantes* because it was duplicative of the definitions found in the instructions on the charged offense.

### E. Harmless Error [16]

" ' "[M]isdirection of the jury, including incorrect, ambiguous, conflicting, *or wrongly omitted instructions* that do not amount to federal constitutional error are reviewed under the harmless error standard articulated" in [*People v. Watson* (1956) 46 Cal.2d 818].' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955 (*Beltran*), italics added.) " '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*Beltran*, at p. 955.)

Our high court has "not yet determined what test of prejudice applies to the failure to instruct on an affirmative defense." (*Salas, supra*, 37 Cal.4th at p. 984.) However, if the more stringent *Chapman* standard for harmless error applies, as it does in the case of

---

[16] We note that, in his briefing, defendant repeatedly represents the evidence in a light favorable to his arguments. For example, he asserts that Dustin's boat had no lookout or spotter, whereas there was evidence that Kim was the lookout on Dustin's boat. Defendant asserts that there was no flag on Dustin's boat. The evidence established that Kim had a flag. Defendant represents that he was operating his boat at a "disputed" speed which may have been within the speed limit. However, the evidence virtually universally indicates that defendant was speeding. Defendant asserts that Dustin did not know the "turn right" rule. Dustin testified that he was "familiar with the rule turning to the right," but further testified that "the only move I could make that day to save seven people" was to turn left to avoid a direct collision with defendant's boat.

39

federal constitutional error such as where a trial court fails to instruct on an element of a crime, reversal is required "unless it can be shown 'beyond a reasonable doubt' that the error did not contribute to the jury's verdict." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324, citing *Chapman, supra*, 368 U.S. at p. 24 & *People v. Flood* (1998) 18 Cal.4th 470, 492-504.)

We conclude that the any instructional error committed by the trial court was harmless under any standard. We address briefly even those instructions the trial court did not abuse its discretion in rejecting.

The evidence established that defendant was intoxicated, driving his boat at an excessive rate of speed and "coming right at" Dustin's boat. Brian described the boat as speeding towards them, just to the right of Dustin's boat. Defendant's boat never slowed down and never changed course.[17] Dustin testified: "the . . . only move I could make there is no doubt in my mind was to turn my boat left. If I had continued my course of action or even gone right I thought he was going to hit us. The only thing I could do is save those lives to save our boat is to move left. It was the only option." Veering left instead of right would have been even more necessary had defendant's boat been approaching Dustin's boat just to the right as Brian described. (See fn. 3, *ante*.)

After it passed, defendant drove his boat "right over the top of" Rachael and Robin on the innertube, running "right through the center of them." Defendant did not slow

---

[17] We note here that, to the extent that defendant argued in the trial court that, unlike Dustin, he acted appropriately by turning his boat to the right, the evidence on this point is conflicting. Most eyewitness testimony indicates that defendant went straight and never changed course. Kim testified that defendant's boat "veered slightly to the right running right over" the victims. Defendant told a private investigator working for the law firm representing one of the victims that he turned the wheel to the right. In any event, defendant did not rely on his self-serving statement to the investigator that he turned right; rather he made the argument that, because his boat was to the right of Dustin's boat, he had the right of way, Dustin's boat was the "give way" boat, and Dustin was required to yield or turn away.

down or turn before hitting the women and it did not stop afterward. O'Bird, defendant's passenger, testified that defendant did not realize that he had run over the victims.

The jury heard ample evidence about the principle embodied in Rule 14, so they had what they would have heard in an instruction by way of testimony. Detective Meyer testified that, generally, if two vessels on Lake Tulloch were approaching each other head-on, the vessels should pass on the right. Deputy Stark also testified that, generally, vessels approaching one another head-on should turn to the right. Moreover, defense counsel in closing identified Rule 14 and described its substance and applicability, and argued that Dustin's boat turned to the left as defendant's boat was coming towards it in violation of the rule, and that this was the cause of the incident. Thus, despite the fact that the jury was not instructed with Rule 14, it was certainly aware of its substance through the testimony and the significance the defense assigned to it. Thus, Rule 14 was before the jury, and not merely through the argument of counsel, which, as the jury was instructed, is not evidence (CALCRIM No. 222), but through competent witness testimony. Thus, the addition of an instruction articulating Rule 14 would not add anything of significance.

Moreover, the jury also heard evidence that Rule 14 was not absolute. Had the trial court instructed on Rule 14, it would have also been required to instruct on potential exceptions. As the Attorney General points out, the prosecution submitted additional boating rules in his response to defendant's proposed instructions. One of those rules was Rule 2(b) of the U.S. Inland Navigation Rules, which provides: "In construing and complying with the U.S. Inland Navigation Rules, due regard shall be had to all dangers of navigation and collision and to any special circumstances . . . *which may make a departure from these Rules necessary to avoid immediate danger*." (Italics added.) There was ample testimony supporting the applicability of the Rule 2(b) exception.

Deputy Cechini, a marine safety officer, testified that, when two vessels approach each other head-on, the primary responsibility is to take action to avoid a collision. He

41

testified that another rule provided that a vessel may take any action necessary to avoid a collision, and thus a vessel is not always required to turn right to avoid a collision. Deputy Stark testified that, while generally, vessels approaching one another head-on should turn to the right, "there are other rules that pertain to doing anything you can to avoid an accident . . . ." "[I]f you see something in front of you, you don't have to turn right you can do what ever you can to avoid that accident specifically slowing your vehicle or your vessel down turning left if you had to. Or completely stopping to make sure there is no accident." Detective Meyer testified that, even with the right of way, a vessel operator must take all precautions necessary to avoid a collision, even if another vessel is violating an applicable law or rule. In referencing "other rules," it seems plain that these witnesses were referencing, at least, the Rule 2(b) exception which allows a boat operator to "make a departure from these Rules necessary to avoid immediate danger."

Lastly, we also note there was no evidence indicating that a right turn maneuver by Dustin would have avoided defendant's collision into the victims on the innertube. The credible evidence established that defendant continued straight, apparently oblivious to Dustin's boat. Defendant has not shown that, had Dustin turned right rather than left, the ultimate result would have been different — that defendant would not have collided into the victims. Based on defendant's own conduct, it is clear the instruction would not have helped him, and thus its omission could not possibly prejudice defendant.

Based on the foregoing, we conclude, beyond a reasonable doubt, the trial court's omission of the proposed Rule 14 instruction did not contribute to the jury's verdict. (*Chapman, supra*, 386 U.S. at pp. 23-24.)

Similarly, we conclude that the omission of Harbors and Navigation Code section 658 (a) and (d) was harmless beyond a reasonable doubt. (*Chapman, supra*, 386 U.S. at pp. 23-24.) The jury heard evidence relevant to the defense theory that the manner in which Dustin operated his boat caused the incident, and defense counsel emphasized this

42

theory repeatedly to the jury. The defense, in other words, maintained that the evidence established that Dustin's vessel did not have a designated lookout (Harb. & Nav. Code, § 658, subd. (a)), and that Dustin operated his vessel in such a way "so as to cause" the innertube "to collide with, or strike against" defendant's boat (*id*., subd. (d)). The jury was instructed properly on causation. And again, there was no evidence establishing that a lookout could have prevented the victim's injuries, let alone evidence that the failure to have one somehow caused those injuries. We conclude, beyond a reasonable doubt, the trial court's omission of these proposed instructions did not contribute to the jury's verdict. (*Chapman,* at pp. 23-24.)

The omission of CACI No. 411, a "pattern jury instruction designed for use in civil negligence cases involving a plaintiff suing a defendant for failing to prevent harm caused by a third party," which was "inapposite given that another party's contributory negligence is not a defense to criminal liability" (*Elder, supra*, 11 Cal.App.5th at p. 135) was likewise harmless beyond a reasonable doubt (*Chapman, supra*, 386 U.S. at pp. 23-24). Again, the jury heard the evidence relevant to defendant's theory that Dustin's actions caused the collision, and was instructed on causation, including that there may be more than one cause of an injury, an act causes bodily injury to another person only if it is a substantial factor in causing the injury, and that a substantial factor need not be the only factor that causes the injury. (CALCRIM No. 2100.) Defense counsel in closing argued the substance of CACI No. 411, telling the jury that one is entitled to expect that others will use reasonable care and that one has the right to assume others' good conduct. We conclude, beyond a reasonable doubt, the trial court's omission of CACI No. 411 did not contribute to the jury's verdict. (*Chapman, supra*, 386 U.S. at pp. 23-24.) Indeed, had the jury been instructed with CACI No. 411 on the principle that a person has the right to expect that every other person will use reasonable care and not violate the law, this almost certainly would have harmed, not helped, defendant's case, because Dustin was entitled to expect defendant would do so as well. It is not disputed that defendant

43

was operating his boat while intoxicated, and the evidence overwhelmingly established that defendant was speeding and oblivious to Dustin's boat, did not look in Dustin's direction, and did not see Dustin's boat or the innertube and the victims — clear violations of the duty of reasonable care and violations of the law.

The omission of CALCRIM No. 3404 on accident was also harmless beyond a reasonable doubt. (*Chapman, supra*, 386 U.S. at pp. 23-24.) The jury heard the evidence and defense counsel's extensive argument premised on the defense theory that the collision was caused by Dustin's acts and that defendant's involvement amounted to mere accident, and rejected this defense under the applicable causation instructions and the overwhelming evidence demonstrating defendant's culpable negligence. We conclude, beyond a reasonable doubt, the trial court's omission of this proposed instruction did not contribute to the jury's verdict. (*Ibid*.)

Nor was defendant prejudiced by the trial court's refusal to instruct with the proposed language from *Cervantes, supra*, 26 Cal.4th at page 871. The standard instructions conveyed the principles contained in defendant's proposed instruction. Defense counsel addressed the issue extensively in closing argument. The proposed instruction would have been confusing[18] and, at best, redundant.

---

[18] As Associate Supreme Court Justice Carol Corrigan, the original chair of CALCRIM committee, noted, "the Blue Ribbon Commission on Jury System Improvement . . . observed: 'jury instructions as presently given in California and elsewhere are, on occasion, simply impenetrable to the ordinary juror. [Citation.] [¶] The reason instructions are so often impenetrable is that they are based on the language of case law and statutes written by and for a specialized legal audience and expressed in terms of art . . . ." (CALCRIM Preface, p. ix, fn. omitted.) To say that the instruction defendant proposed here, parroting text from the appellate opinion in *Cervantes*, was impenetrable would have been an understatement. A trial court may refuse proposed instructions that may be potentially confusing. (*Moon, supra,* 37 Cal.4th at p. 30; *Jo*, *supra*, 15 Cal.App.5th at p. 1174.)

Moreover, any error was harmless beyond a reasonable doubt because it is clear that a rational jury would have found defendant guilty absent any error. Even if Dustin's actions could be described as an intervening cause of the victims' injuries, they would relieve defendant of criminal liability only if the jury found that defendant's actions of driving under the influence, speeding, failing to observe Dustin's boat and the victims on the innertube, and running directly over them while maintaining his course and speed was not a concurrent cause of the victims' injuries. No reasonable jury could have found that defendant's actions were not a concurrent cause of the victim's injuries. (*People v. Crew* (2003) 31 Cal.4th 822, 847 [any error in causation instructions harmless beyond a reasonable doubt; even if third-party's actions were an independent intervening cause of the victim's death, no reasonable jury could have found the defendant's act of shooting the victim in the head was not a concurrent cause of her death].)

As asserted by the Attorney General, no reasonable jury could have found that the manner in which Dustin operated his vessel was " ' "unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." ' " (*Cervantes, supra*, 26 Cal.4th at p. 871, quoting *People v. Armitage* (1987) 194 Cal.App.3d 405, 420-421.)

Viewing the instructions as a whole and in light of the overwhelming evidence, we conclude that any errors in the refusal to give defendant's proposed pinpoint instructions were harmless beyond a reasonable doubt. (*Chapman, supra*, 386 U.S. at pp. 23-24.)

### III. Section 12022.7 and Personal Infliction

### A. Defendant's Contentions

Defendant asserts that he did not *personally inflict* the injuries to the victims as required by section 12022.7. Defendant asserts that, because of Dustin's conduct, the evidence did not establish defendant was the *direct* cause, as opposed to merely the *proximate* cause, of the victim's injuries.

45

## B. Section 12022.7, Personal Infliction, and Standard of Review

Insofar as relevant here, section 12022.7 provides: "(a) Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years. [¶] (b) Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony which causes the victim to become comatose due to brain injury or to suffer paralysis of a permanent nature shall be punished by an additional and consecutive term of imprisonment in the state prison for five years." (§ 12022.7, subds. (a), (b).)

" '[T]he phrase "personally inflicts" means that someone "in person" . . . , that is, directly and not through an intermediary, "cause[s] something (damaging or painful) to be endured." ' " (*People v. Ollo* (2021) 11 Cal.5th 682, 688 (*Ollo*).) Thus, a defendant "personally inflicts" great bodily injury if he directly causes the injury—that is, if the defendant "himself" "actually" "inflicts the injury" by "directly perform[ing] the act that causes the physical injury." (*People v. Cole* (1982) 31 Cal.3d 568, 572-573, 579 (*Cole*).) Consequently, it is not enough to show that the defendant proximately caused the great bodily injury, i.e., that the defendant's conduct was a "substantial factor contributing" to the injury because that conduct set in motion the chain of events that naturally and probably resulted in the injury. (*People v. Rodriguez* (2001) 69 Cal.App.4th 341, 346-347 (*Rodriguez*).) " 'Proximately causing and personally inflicting harm are two different things.' " (*Ollo*, at p. 693.) However, the acts of more than one person can combine to cause an injury and a defendant whose act is one of two concurrent direct causes of an injury is liable for personal infliction under section 12022.7 even if that injury is inflicted accidentally. (*People v. Guzman* (2000) 77 Cal.App.4th 761, 764 (*Guzman*).)

46

"To the extent defendant challenges the sufficiency of the evidence, we view the evidence in the light most favorable to the judgment to determine whether it discloses substantial evidence, i.e., evidence that is reasonable, credible, and of solid value, such that a reasonable trier of fact could find the essential elements of the charged crime or allegation proven beyond a reasonable doubt." (*People v. Elder* (2014) 227 Cal.App.4th 411, 417 (*Elder*).)

## C. Analysis

Substantial evidence supports the determination that defendant personally inflicted great bodily injury on the victims here. The evidence established that defendant, while intoxicated, drove his boat extremely fast, over the speed limit, directly at Dustin's boat. Defendant did not look at Dustin's boat. Dustin turned left to avoid a head-on collision, and testified that, had he not performed that maneuver, defendant's boat would have "split us in half." Passing within three to 10 feet of Dustin's boat, defendant never slowed down and never changed course. Defendant then drove his boat "right over the top of" Rachael and Robin, running "right through the center of them." Defendant did not slow down or turn before hitting the women and did not stop afterward. The two victims sustained great bodily injury, a fact that was not contested at trial and is not contested on appeal. Defendant was clearly a *direct cause* of the victims' injuries.

Defendant maintains that Dustin caused the accident by turning left and "whipp[ing] the tube with the two women on it in the path of defendant's boat," and that therefore defendant did not personally cause his boat to collide with the victims. However, the jury obviously rejected this defense theory, argued extensively by defense counsel. In addition to all of the testimony concerning the manner in which defendant operated his vessel, evidence which we view in the light most favorable to the judgment, there was evidence to establish that the "turn right" rule was not absolute, and that a primary directive in operating a vessel on the lake was to do anything necessary to avoid a collision.

47

Defendant emphasizes that proximate cause is not enough and relies on *Rodriguez, supra,* 69 Cal.App.4th 341. "In *Rodriguez*, the issue was whether a prior conviction for resisting a peace officer resulting in bodily injury was a serious felony under the three strikes law, as a felony in which the defendant 'personally inflicted' [great bodily injury] [citation]. The evidence of the prior conviction showed only that the officer tackled the defendant, who was fleeing on a bicycle, and when both men fell to the ground, the officer hit his head and was injured. [Citation.] In asking the jury to decide whether the defendant's prior conviction constituted a serious felony, the trial court instructed the jury that a person personally inflicts injury when he directly performs an act that causes the injury, but the court also instructed the jury, ' "A cause of an injury is an act that sets in motion a chain of events that proceed [*sic*] a direct, natural and possible consequence of the act, the injury, and without which the injury would not occur." ' [Citation.] The appellate court in *Rodriguez* held the instruction improperly equated 'personally inflict' with 'proximate cause.' [Citation.] 'To "personally inflict" injury, the actor must do more than take some direct action which proximately causes injury. The defendant must directly, personally, himself inflict the injury.' [Citation.] The court concluded the instructional error was prejudicial because, as a matter of law, the evidence did not show that the defendant directly inflicted the injury. [Citation.] The court observed, '[the defendant] did not push, struggle or initiate any contact with the officer during the 1992 incident. Instead, the evidence shows that Rodriguez was trying to escape arrest on a bicycle and *the officer injured himself* when he tackled [the defendant].' " (*Elder, supra*, 227 Cal.App.4th at pp. 420-421, discussing *Rodriguez*, at pp. 346-349, 352 (some italics omitted).)

*Rodriguez* does not help defendant. The instant case is nothing like *Rodriguez*, where the defendant did not initiate contact with the alleged victim and the alleged victim injured himself. Indeed, our case is much more like *Guzman, supra,* 77 Cal.App.4th 761. There, the appellate court upheld the "personally inflicted" great bodily injury

48

enhancement under section 12022.7, where the defendant violated the Vehicle Code by making an unsafe left turn in front of another vehicle which collided into defendant's vehicle, causing injury to the defendant's passenger. The *Guzman* court rejected the defendant's argument that the other driver was the cause of defendant's passenger's injuries, reasoning that the defendant's "volitional act" of turning his car into oncoming traffic "was the direct cause of the collision and therefore was the direct cause of the injury." (*Guzman*, at p. 764.) "[T]he fact that the collision involved two vehicles does not absolve [the defendant] of direct responsibility for [the victim's] injuries." (*Ibid*.)[19] Here, like in *Guzman*, defendant's volitional act directly caused the victims' injuries.

Viewing the evidence in the light most favorable to the judgment, substantial evidence supports the true findings on the enhancement allegations. Defendant "himself" "actually" "inflict[ed] the injur[ies]" by "directly perform[ing] the act that cause[d] the physical injury." (*Cole, supra*, 31 Cal.3d at pp. 572-573, 579.)

**IV. Imposition of Two Section 12022.7, Subdivision (b), Enhancements**

Defendant asserts that the trial court erred in imposing two section 12022.7, subdivision (b), enhancements for both victims when there was only one offense alleged in the information. Defendant asserts that "[o]ne of the enhancements should be stricken or at the very least, suspended."

Section 12022.7, subdivision (h), states: "The court shall impose the additional terms of imprisonment under either subdivision (a), (b), (c), or (d), but may not impose more than one of those terms for the same offense."

---

[19] The *Guzman* court further noted, "the accidental nature of the injuries suffered does not affect this analysis" because "[t]he 1995 amendment to section 12022.7 deleted the requirement that the defendant act 'with the intent to inflict the injury.' " (*Guzman, supra*, 77 Cal.App.4th at p. 764.)

This argument was addressed and rejected in *People v. Ausbie* (2004) 123 Cal.App.4th 855, 864 (*Ausbie*), disapproved on another ground in *People v. Santana* (2013) 56 Cal.4th 999, 1011, fn. 6.  The *Ausbie* court wrote:  "Appellant contends the language of section 12022.7, subdivision (h) is clear and unambiguous and precludes the imposition of more than one enhancement.  Respondent contends there is no error because there were two victims, two special findings by the jury (one as to each victim) and appellant should not receive a 'windfall' because the prosecutor gave a 'substantial break' to appellant by combining both victims into one count.  [¶]  Contrary to appellant's argument, the statutory language does not limit the number of section 12022.7, subdivision (a) enhancements to be imposed when there are multiple victims.  Properly construed, subdivision (h) simply prohibits the trial court from imposing more than one section 12022.7 enhancement for injury to an individual victim." (*Ausbie*, at p. 864.)  "We . . . construe section 12022.7, subdivision (h) as limiting the sentencing court to one of the subdivision (a), (b), (c), or (d) enhancements for each injured victim, but not as prohibiting the court from imposing a section 12022.7 enhancement for each victim of a single offense when there are multiple victims who suffered great bodily injury." (*Ausbie*, at p. 864.)  We agree with the *Ausbie* court.

## V.  Fees

The trial court at sentencing imposed a court operations assessment (formerly a court security fee) of $40 (§ 1465.8) and a criminal conviction assessment fee of $30 (Gov. Code, § 70373).  However, these fees are not reflected in the abstract of judgment. We shall order the abstract corrected to reflect the trial court's imposition of these fees.

50

## DISPOSITION

The judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment reflecting the imposition of the court operations assessment and criminal conviction assessment and to forward a certified copy of the abstract to the Department of Corrections and Rehabilitation.

/s/
MURRAY, J.

We concur:

/s/
BLEASE, Acting P. J.

/s/
ROBIE, J.